UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JAMES HARR and COMRADE
WORKWEAR, LLC,

             Plaintiffs,

       v.

THE CITY OF NEW YORK, NYP
HOLDINGS, INC d/b/a THE NEW YORK
POST, and JESSICA TISCH in her individual
capacity,

             Defendants.

**MEMORANDUM & ORDER**
25-CV-2209 (HG)

**HECTOR GONZALEZ**, United States District Judge:

In 2003, in connection with the invasion of Iraq, the United States Department of Defense developed a deck of playing cards, titled "Iraqi Most Wanted," to help familiarize troops with members of Saddam Hussein's government and inner circle.[1]  Approximately 20 years later and days after UnitedHealthcare CEO, Brian Thompson, was shot and killed, Plaintiffs James Harr and Comrade Workwear, LLC developed a deck of cards, modeled after the U.S. military's deck, titled "Most Wanted CEOs."  *See generally* ECF No. 6.[2]  Plaintiffs allege that immediately after they released the final designs and began accepting pre-orders, Defendants launched a coordinated smear campaign designed to inflict financial, reputational, and constitutional harm on them for exercising their First Amendment rights.  *See generally id.*

---

[1]     *See* Linda D. Kozaryn, *Deck of cards helps troops identify regime's most wanted*, AM. FORCES PRESS SERVICE (Apr. 12, 2003) https://perma.cc/G9WD-JYRB.

[2]     Unless otherwise indicated, when quoting cases and the parties' papers, the Court omits all internal quotation marks, alteration marks, emphases, footnotes, and citations.  The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

Plaintiffs brought the instant action in April 2025, against Commissioner Jessica Tisch (in her individual capacity) under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments, and assert state-law claims against the City of New York (the "City"), Commissioner Tisch (together, with the City, the "City Defendants"), and NYP Holdings d/b/a The New York Post ("NYP") for defamation, tortious interference with prospective business relations, abuse of process, and conversion. *See* ECF No. 6 ¶¶ 43–87.

Defendants move to dismiss the action pursuant to Rule 12(b)(6), and, for the reasons that follow, those motions are GRANTED.

## **BACKGROUND**

### I.     **Relevant Facts[3]**

#### *A.      The "Most Wanted CEOs" Playing Cards*

In December 2024, Plaintiffs conceived and developed, what they describe as, "a satirical playing card deck titled Most Wanted CEOs." ECF No. 6 ¶ 18. Plaintiffs modeled the cards after "the U.S. military's 2003 'most wanted' Iraqi playing cards," intending them to be a work of "symbolic parody" that "raise[d] public awareness of corporate misconduct through symbolic parody." *See id.* Plaintiffs' cards:

> featured a well-known corporate executive, their affiliated company, and a QR code linking to educational content about the harm their company allegedly caused, with each suit representing an industry—pharmaceuticals and chemicals, essential goods and housing, finance and tech, and weapons and oil—all based on public information, with no contact details or other personal information included.

ECF No. 6 ¶ 19.

---

[3]     The Court "recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).

### B.     The Article and Other Coverage

On December 15, 2024, Plaintiffs unveiled the final designs for the Most Wanted CEO cards and launched preorders.  ECF No. 6 ¶ 20.  The product description for the cards read:  "For educational and entertainment purposes only."  *Id.*  Later that day, NYP published an article on its website that claimed Plaintiffs "call[ed] online for the death of corporate executives" and linked "the release of the playing cards to the recent homicide of UnitedHealthcare CEO Brian Thompson" (the "Article").  *Id.* ¶¶ 21–23.[4]  The Article included a screenshot of one of Plaintiff's social media posts which contained the phrase:  "The CEO must die."  *Id.* ¶ 22.  The screenshot in the Article omitted Plaintiffs' caption to the post, a "disclaimer" that read, in part:  "When we say the CEO must die, we mean the structure of capitalism must be broken."  *Id.*

On December 16, 2024, NYP published the Article as its cover story.  *See id.* ¶ 24; ECF No. 31-6.  Overnight, the Article, and, consequently, Plaintiffs' playing cards were front-page news.  *Id.*  That same morning, New York City Police Department ("NYPD") officers arrived at Harr's home and spoke with his fiancée.  ECF No. 6 ¶ 25.  A little later, officers interviewed Harr at his workplace and "questioned him about the cards and whether he had violent intent or ties to any extremist groups."  *Id.*  Plaintiffs allege Harr informed the officers that "he was an independent artist running a merchandise company, that the cards were a symbolic and educational project, and that he had [already] made public disclaimers rejecting violence."  *Id.* ¶ 27.

---

[4]     Online and print editions of the Article are attached as exhibits to NYP's Motion to Dismiss.  *See* ECF Nos. 31-6 (print edition), 31-7 (online edition); *see also* Chris Nesi, *Socialist clothing company founder creating disturbing 'most wanted CEOs' playing cards in wake of UnitedHealthcare shooting*, N.Y. Post (Dec. 15, 2024, at 4:07 p.m. ET), https://perma.cc/XYS8-CFG6.

The next day, Commissioner Tisch spoke at a press conference announcing that an individual had been arrested in connection with the investigation of Mr. Thompson's homicide (the "December Press Conference"). *Id.* ¶¶ 28–29, 61. Plaintiffs allege that Commissioner Tisch "held up [the print edition of the Article] and falsely described [Plaintiffs'] playing cards as a 'hit list,' call[ed] him an 'extreme activist,' and part of a 'lawless, violent mob' calling for the 'targeted assassination' of CEOs." *Id.* ¶ 28.

C.     *The Alleged Backlash*

The Commissioner's statements, Plaintiffs claim, marked the inception of a campaign to punish Plaintiffs for the cards. In their view, the Article, NYPD interviews, and December Press Conference were part of "a coordinated effort to distort the nature of [Plaintiffs'] work and publicly reframe [them] as a threat in order to support a broader narrative around political violence and public disorder." *Id.* ¶ 30. Before and after the December Press Conference, Plaintiffs were "de-platformed" (*i.e.*, permanently disabled from accessing) several social media and e-commerce platforms that were integral to their business. ECF No. 6 ¶¶ 31–34.

Approximately two months after the December Press Conference, law enforcement officials from the NYPD "served a seizure warrant on the FedEx facility where Plaintiff[s'] inventory of playing cards was being stored, resulting in the confiscation of [their] entire preorder shipment." *Id.* ¶¶ 35–38. Plaintiffs assert that confiscation of their merchandise was carried out at the behest of Commissioner Tisch and part of Defendants' coordinated effort to "systematically strip[] [Plaintiffs] of access to the platforms and tools that allowed [them] to speak, sell, and operate," and inflict "reputational, financial, and constitutional harm." *Id.* ¶ 42.

## II. Procedural History

Plaintiffs commenced this action on April 21, 2025, by filing a complaint against the Defendants. *See* ECF No. 1. Approximately two weeks later, Plaintiffs amended their complaint as a matter of course. *See* ECF No. 6 (the "Amended Complaint"). After filing pre-motions letters in anticipation of their motions to dismiss, ECF Nos. 20, 22, Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6), *see* ECF Nos. 26, 28 (City Defendants' Motion to Dismiss and Memorandum); ECF Nos. 29, 30 (NYP's Motion to Dismiss and Memorandum).[5] Plaintiffs then filed their opposition to the City Defendants' Motion, ECF No. 34 ("Opposition"), but did not respond to NYP's Motion. Shortly thereafter, Defendants filed their replies. *See* ECF No. 37 (NYP's Reply); ECF No. 38 (City Defendants' Reply).

## LEGAL STANDARD

Defendants move to dismiss the Amended Complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under this Rule, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matzell v. Annuci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678). In making this assessment, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v.*

---

[5] The Court stayed discovery in this matter pending resolution of Defendants' motions to dismiss. *See* Aug. 1, 2025, Text Order.

*Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).[6]  The Court must, however, disregard any "conclusory allegations, such as formulaic recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678.  A pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice.  *Id.*

**DISCUSSION**

Plaintiffs bring six causes of actions against Defendants:  (1) a First Amendment violation, pursuant to 42 U.S.C. § 1983, against Commissioner Tisch; (2) a claim for stigma plus, pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, against Commissioner Tisch; (3) a state-law defamation claim against the City and NYP; (4) a state-law claim for tortious interference with prospective business relations against the City and Commissioner Tisch; (5) a state-law claim for abuse of process against the City; and (6) a state-law claim for conversion against the City.[7]  *See* ECF No. 6 ¶¶ 43–87.  The Court begins with Plaintiffs' federal claims (*i.e.*, Claims 1–2).

### I.       First Amendment Retaliation

Plaintiffs' first cause of action alleges that the Commissioner, motivated "by animus toward Plaintiffs' viewpoint," retaliated against them "for disfavored political expression," and "unlawfully burdened Plaintiffs' right to free expression."  ECF No. 6 ¶¶ 45–47.

---

[6]     The Court may consider the online and print editions of the Article, and Commissioner Tisch's statements at the December Press Conference for purposes of Defendants' Rule 12(b)(6) motions because they are the subject of several of Plaintiffs' claims.  *See Tannerite Sports LLC v. NBC Universal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d. Cir. 2002)).

[7]     Plaintiffs' Amended Complaint includes two "fifth" causes of action.  *See* ECF No. 6 at 12.  The Court corrects that numbering error for the purposes of this Order.

"To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss," Plaintiffs "must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

City Defendants argue this claim fails for several reasons. Specifically, that: (1) Plaintiffs' speech is considered a "true threat" and therefore not protected by the First Amendment; (2) the Commissioner's statements do not amount to an adverse action; (3) Plaintiffs have failed to plead a sufficient causal connection; and (4) the Commissioner's statements are themselves protected under the First Amendment. ECF No. 28 at 26–28.

### A.     Plaintiffs' Speech is not a "True Threat"

From its inception in 1791, "the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas.'" *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Those areas, or categories of speech, include: incitement, defamation, obscenity, and, relevant here, true threats. *Id.* at 73–74 (collecting cases). "True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Id.* at 72. A "true threat" is a "'serious expression' conveying that a speaker means to 'commit an act of unlawful violence,'" regardless of whether "the speaker is aware of, and intends to convey, the threatening aspect of the message." *Id.* at 74 (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003); *Elonis v. United States*, 575 U.S. 723, 733 (2015)). The Second Circuit's "test for whether conduct amounts to a true threat 'is an objective one— namely, whether an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury.'" *United States v. Turner*, 720 F.3d 411,

420 (2d Cir. 2013) (quoting *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006)). The speaker's intent is also relevant. To be a true threat, the speaker must make the statement "at least recklessly by consciously disregarding the 'risk that his communication would be viewed as threatening violence.'" *United States v. Hunt*, 82 F.4th 129, 134–35 (2d Cir. 2023) (quoting *Counterman*, 600 U.S. at 66).[8]

Here, the speech at issue is not a single utterance but rather a collection of statements and expressive conduct. City Defendants point to the playing cards themselves, but also Plaintiffs' social media activity surrounding their release. They highlight that "Plaintiffs made a social media post stating, '[t]he CEO must die,' as well as cards depicting the names and faces of CEO[s], with the reverse side depicting gun range human silhouette shooting targets, during a period of tremendous public discourse surrounding the murder of UnitedHealthcare CEO Brian Thompson." ECF No. 28 at 27. They also point out some of Plaintiffs' other social media posts from around the time the playing cards were released, including posts celebrating Mr. Thompson's killer (referring to the killer as "fucking hero"), and encouraging their followers to "do more" to "identify[] another healthcare CEO by name and photograph, [by] pointing to the name of a city, and instructing [their] followers to do research because [Harr] did not 'know if this is where [the other CEO] lives, but it's where she's from.'" *Id.* In City Defendants' view, those statements and conduct, taken together, amount to a true threat. *Id.*

Plaintiffs acknowledge that the design of their playing cards was "modeled on the U.S. military's 2003 'most wanted' Iraqi cards," and that their social media post stated "[t]he CEO

---

[8] Courts consider the objective effect on the listener and the speaker's intent in conjunction to take care not to sweep too much speech out of the First Amendment's ambit. *Counterman*, 600 U.S. at 75. Of course, consideration of the speaker's intent protects "some true threats from liability," but this is a compromise to "reduce[] the prospect of chilling fully protected expression." *Id.*

must die." ECF No. 6 ¶¶ 18, 22. However, Plaintiffs assert that the Article (and, consequently, Commissioner Tisch) "intentionally omitted the caption that appeared with [the social media post], which read in part: 'When we say the CEO must die, we mean the structure of capitalism must be broken.'" *Id.* ¶ 22. Plaintiffs argue that their statements do not amount to true threats, especially considering their disclaimers "explicitly disavowed violence." *See* ECF No. 34 ¶¶ 44–45 ("Plaintiff[s'] own disclaimers make clear that [their] work was symbolic critique, not a threat of harm.").

"[A]ccept[ing] as true all of the factual allegations set out in [Plaintiffs'] complaint," and "draw[ing] inferences from those allegations in the light most favorable to [Plaintiffs]," as the Court must at this juncture, *Roth*, 489 F.3d at 510, the Court concludes that the speech at issue does not constitute a true threat because Plaintiffs' speech does not amount to "serious expression[s] of [their] intent to commit an act of unlawful violence to a particular individual or group of individuals." *See Black*, 538 U.S. at 359. The playing cards are not enough to convey to a reasonable listener that they were intended as a threat of violence against the "well-known corporate executive[s]" featured on them. The cards included anodyne, publicly-available information about the executives and "educational content about the harm their compan[ies] allegedly caused." ECF No. 6 ¶ 19. Simply, the cards do not convey anything about Plaintiffs' intent. At most, the cards are suggestive, but that is far from a serious expression of violent intent. *See Counterman*, 600 U.S. at 74. And, any incidental suggestion of violence is negated by Plaintiffs' disclaimers.

Plaintiffs' statement that "[t]he CEO must die" also cannot reasonably be interpreted as a serious threat of injury. As a practical matter, that statement is directed at "the CEO"—an archetypal executive, not a particular individual or group, *contra Black*, 538 U.S. at 359—and,

9

again, Plaintiffs' disclaimer in the caption of the social media post clarifies that the statement was not one of violent intent, but a more general critique of capitalism writ large, *see* ECF No. 6 ¶ 22; *see also Black*, 538 U.S. at 359 (quoting *Watts v. United States*, 394 U.S. 705, 708 (1969)) ("political hyperbole" is not a true threat).

Plaintiffs' statement "calling Mr. Thompson's killer a 'fucking hero'" does not reflect a threat at all—serious or otherwise. The statement, standing alone or considered alongside the others, may be coarse or disquieting, but that does not remove its First Amendment protection. If anything, it does the opposite. *See Texas v. Johnson*, 491 U.S. 397, 408–09 (1989) (acknowledging that "a principal function of free speech under our system of government is to invite dispute," that is "best serve[d] . . . when [speech] induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger").

As for Plaintiffs' statements that purportedly encouraged their social media followers to "do more" to identify where another healthcare CEO lived, City Defendants' argument is far too speculative to establish it as an expression of violent intent, let alone a *serious* expression of violent intent against that person.[9]

Even if the Court were to take the playing card design and all the accompanying social media statements together, it cannot conclude that "an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury." *Turner*, 720 F.3d at 420. Thus, Plaintiffs' speech is not a true threat. Nor is it incitement, obscenity, or

---

[9]     Had City Defendants argued that this particular statement was incitement, they might have had a stronger point. Ultimately, however, that argument would also fail because there is "no evidence or rational inference from the import of the language, that [Plaintiffs'] words were intended to produce, and likely to produce, imminent disorder." *Hess v. Indiana*, 414 U.S. 105, 108–09 (1973); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) (Speech is presumptively protected unless it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

any other form of unprotected speech; it is protected speech. *See United States v. Stevens*, 559 U.S. 460, 468–70 (2010) (speech outside the "well-defined and narrowly limited classes of [unprotected] speech" retains full protection). Plaintiffs are constitutionally entitled to condemn and disparage well-known executives of major corporations. *See Turner*, 720 F.3d at 420–21 (quoting *Watts*, 394 U.S. at 708) ("[D]ebate on public issues should be uninhibited, robust, and wide open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks."). Plaintiffs have satisfied the first element of their prima facie case. *See Dolan*, 794 F.3d at 294. Their First Amendment claim survives, for now.

> B.   *Commissioner Tisch Took no Adverse Action Against Plaintiffs*

It does not survive much longer. Recall that Plaintiffs must still sufficiently plead that Commissioner Tisch took adverse action against them and that there was a causal connection between the protected speech and such action. *See Dolan*, 794 F.3d at 294. Plaintiffs fail to meet these requirements.

"In the context of a First Amendment retaliation claim," the Second Circuit has held that "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004). Plaintiffs must also allege that Commissioner Tisch "'took an adverse action in response to [their] speech that would not have been taken absent the retaliatory motive.'" *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 387 (2d Cir. 2025) (quoting *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022)).

Plaintiffs allege that at the December Press Conference, Commissioner Tisch "held up" the Article "and falsely described Plaintiff[s'] playing cards as a 'hit list,' call[ed] [Harr] an 'extreme activist' and part of a 'lawless, violent mob' calling for the 'targeted assassination' of

11

CEOs." ECF No. 6 ¶ 28. In Plaintiffs' view, Commissioner Tisch's conduct "distorted the content and purpose of Plaintiffs' message, portraying it as a violent threat in a public setting," *id.* ¶ 46, which effectively "urged the public and private actors to reject and condemn [them]," and led to Plaintiffs being "de-platformed by Instagram, TikTok, Shopify, PayPal, and other major intermediaries that served as his sole channels for expression and sales," ECF No. 34 ¶ 52.

City Defendants' account of the December Press Conference is more milquetoast. In their view, "Commissioner Tisch merely, and briefly, held up the New York Post article, without mentioning [Plaintiffs] by name, and stated, generally, what had been reported in the article." ECF No. 28 at 28. In light of this, they argue that Commissioner Tisch's "actions do not amount to an adverse action or retaliation against [P]laintiffs." *Id.*

City Defendants oversimplify Plaintiffs' allegation. Yes, Plaintiffs take issue with Commissioner Tisch's statements at the press conference, but the thrust of their retaliation claim is that Commissioner Tisch's statement induced third-party social media and e-commerce platforms to remove him from "the tools and platforms that sustained [their] business and speech," ECF No. 6 ¶¶ 30–34, and caused the NYPD to execute a seizure of Plaintiffs' inventory, *id.* ¶ 35.[10] Still, even though the Court accepts Plaintiffs' facts, *see Roth*, 489 F.3d at

---

[10] In their Opposition, Plaintiffs assert that the NYPD "executed a warrantless seizure." ECF No. 34 ¶ 53. This is puzzling, because it is directly contradicted by the Amended Complaint and by the other parts of Plaintiffs' Opposition. *See, e.g.*, ECF No. 6 ¶¶ 35–36 (alleging that "[o]n or about February 20, 2025, law enforcement officials served a seizure warrant on the FedEx facility where Plaintiffs' inventory of playing cards was being stored"); ECF No. 34 ¶ 92 ("Plaintiffs have adequately alleged that the City, through the NYPD, abused legal process by executing a seizure warrant for the collateral purpose of suppressing protected speech."). To the extent Plaintiffs meant to argue that the seizure was, in fact, conducted without a warrant, that argument is meritless. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (A plaintiff "is not entitled to amend its complaint through statements made in motion papers.").

499, it agrees with City Defendants that Commissioner Tisch's actions do not amount to an adverse action sufficient to sustain Plaintiffs' First Amendment claim.

At bottom, the relevant "action" that Plaintiffs allege is an adverse action for purposes of their First Amendment claim is Commissioner Tisch's speech at the December Press Conference. That is insufficient because speech, in response to speech, is not an adverse action, even if it is harsh. *See Ronan v. Legal Aid Soc'y*, No. 24-cv-07201, 2026 WL 879407, at *10 (E.D.N.Y. Mar. 31, 2026) ("[I]t is well settled that criticism of [a speaker] alone" does not amount to an adverse action "for retaliation purposes."); *Carl v. Griffin*, No. 08-cv-4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) ("Verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim.").

Even if Commissioner Tisch's statements are read "in the light most favorable" to Plaintiffs, *Roth*, 489 F.3d at 510, they would not "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *Washington*, 373 F.3d at 320. In condemning Plaintiffs' speech, Commissioner Tisch exercised her own First Amendment rights. *See Johnson v. Bd. of Educ. Ret. Sys. of City of New York*, No. 18-cv-4605, 2021 WL 2133434, at *5 (E.D.N.Y. May 11, 2021), *aff'd sub nom. Johnson v. Miller*, 2022 WL 17076718 (2d Cir. Nov. 18, 2022) ("The First Amendment applies to public employees and protects their right to speak as a citizen addressing matters of public concern."). Speech in response to speech does not deter individuals from exercising their First Amendment rights, it is the whole point of the Freedom of Speech Clause. *See Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) (The remedy to "falsehood and fallacies," is "more speech, not enforced silence."); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 14 (1986) (plurality opinion)

(First Amendment does not provide a "right to be free from vigorous debate"). Moreover, to interpret Commissioner Tisch's constitutionally protected speech as an adverse action would effectively flip the First Amendment on its head and allow Plaintiffs to enlist the judiciary to block speech that they do not like. *See Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) ("It would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation.").

Plaintiffs' allegations do not "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Accordingly, they have failed to establish the second element of their prima facie case. *See Dolan*, 794 F.3d at 294.

### C.    Causation Problems

Even if the Court credited Plaintiffs' speculative argument that Commissioner Tisch's statements amount to an adverse action, their First Amendment Retaliation claim would fail, nonetheless, because Plaintiffs' theory of causation is supported only by their own conclusory allegations. *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*, No. 13-cv-4340, 2015 WL 1379702, at *6 (S.D.N.Y. Mar. 25, 2015), *aff'd*, 637 F. App'x 16 (2d Cir. 2016) ("[C]onclusory allegations of causation will simply not support a First Amendment retaliation claim.").

The Court disagrees with Plaintiffs that it is reasonable to infer that Commissioner Tisch's statements and her official position "significantly encouraged" or "influenced" third parties to remove Plaintiffs' access to social media and e-commerce platforms. *See* ECF No. 34 ¶ 52. Nor does the Court agree that "[t]he timing and context make the causal link [between Plaintiffs' speech and seizure of their work] unmistakable." *Id.* ¶ 55. Both of those assertions are far too attenuated to be plausible. Indeed, a significant amount of second- and third-order thinking is necessary to find it plausible that Commissioner Tisch's statements at the December

Press Conference were intended to set off a chain of events ultimately designed to silence Plaintiffs or others from participating in public dialogue. In fact, to conclude that Plaintiffs' speculative and conclusory allegations are sufficient to survive City Defendants' Motion to Dismiss, the Court would have to make a series of *unreasonable* inferences. *Contra Iqbal*, 556 U.S. at 678; *Munoz-Feliciano*, 2015 WL 1379702, at *6.

For example, Plaintiffs assert that the de-platforming decisions were made because of Commissioner Tisch's statements on December 17, 2024. *See* ECF No. 6 ¶¶ 28–34, 40. For the Commissioner's speech to have the outsized effect that Plaintiffs claim it did, one might expect that all the de-platforming decisions were made after the December Press Conference. But, according to Plaintiffs, their "main Instagram account was permanently banned" a day before Commissioner Tisch said anything about Plaintiffs publicly. *See* ECF No. 6 ¶¶ 28, 32. One also might expect there to be some allegation that Instagram, TikTok, YouTube, Shopify, or other platform providers were directed to disable Plaintiffs' accounts, or at least that they provided some pretextual reason for the decisions. Plaintiffs allege neither. In fact, they concede that the platforms explained their decisions were based not on the Commissioner's or the City's say-so, but on the platforms' own internal policies or decisions from "its banking partners, including Mastercard and Visa." ECF No. 6 ¶¶ 33, 34. In that case, one might expect, if nothing else, that there would be some allegation that the platform providers saw or knew about Plaintiffs' playing cards, or Commissioner Tisch's statements. But there are no such allegations in the Amended Complaint. *See Munoz-Feliciano*, 2015 WL 1379702, at *6 (lack of "specific allegation that any particular [party] was aware of" particular statements was "fatal to [p]laintiff's First Amendment claim").

Plaintiffs elide over these conspicuous absences.  They state, in conclusory fashion, that the online platforms' decisions were "foreseeable and intended," and urge the Court to see those decisions "[a]s a direct and proximate result of Defendant Tisch's actions."  ECF No. 6 ¶¶ 40, 48.  But to view Commissioner Tisch's statements and their purported influence on second- and third-order decisions as Plaintiffs do, the Court must connect dots far flung across multiple days, weeks, and months, and spread out among multiple parties and third parties.  That does not "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  To arrive at Plaintiffs' interpretation—that the Commissioner, the City, and various third-party entities concocted a scheme to "systematically strip[]" Plaintiffs' access to important online platforms and inflict "reputational, financial, and constitutional harm," *see generally* ECF No. 6—not only requires the Court make a *series* of inferential leaps, but also would force the Court to credit "mere conclusions [that] are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679.  That does not make Plaintiffs' theory of causation plausible.  *See id.* at 678; *Munoz-Feliciano*, 2015 WL 1379702, at *6.

Accordingly, because Plaintiffs have established neither the second nor third element of their prima facie case, they have failed to state a cognizable First Amendment retaliation claim.[11] For these reasons, that claim is dismissed.

---

[11]    In light of this conclusion, the Court need not reach City Defendants' argument that Commissioner Tisch is entitled to qualified immunity with respect to the First Amendment claim.  *See* ECF No. 28 at 28–31.

## II. Stigma-Plus

For their second cause of action, Plaintiff Harr asserts a stigma-plus claim against Commissioner Tisch.[12] To state a stigma-plus claim, Plaintiffs must show: "(1) the utterance of a statement 'sufficiently derogatory to injure [their] reputation, that is capable of being proved false, and that [they] claim[] is false," and (2) a material state-imposed burden or state-imposed alteration of [their] status or rights." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004). In other words, "even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process." *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010).

The "stigma" and "plus" elements need not "issue from the same government actor or at the same time, [but] they must be 'sufficiently proximate.'" *Mudge v. Zugalla*, 939 F.3d 72, 80 (2d Cir. 2019) (quoting *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005)). Because "the availability of adequate process defeats a stigma-plus claim," "in order to bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was deprived without due process of law." *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006).

City Defendants argue this claim should be dismissed because Plaintiffs cannot satisfy the "stigma" requirement because Commissioner Tisch's statements are, among other things, substantially true, nonactionable opinion, and not grossly irresponsible. *See* ECF No. 28 at 17– 25. They also argue that Plaintiffs' fail to establish the "plus" requirement because Plaintiffs "allege[] merely reputational harm, loss of business relationships, and exclusion from social

---

[12] Although the second cause of action is brought on behalf of Harr only, ECF No. 6 at 9, the Court construes the stigma-plus claim as brought by both Plaintiffs, given that their Opposition refers to both Harr and his company, collectively, in connection with this claim, *see* ECF No. 34 ¶¶ 18–37.

media platforms" and such allegations are not a material state-imposed burden or alteration of status or rights. *See id.* at 25–26.

Plaintiffs, unsurprisingly, see it differently. They argue that their claim should survive because they have satisfied the "stigma" requirement by alleging that Commissioner Tisch's statements at the December Press Conference are: (1) "sufficiently derogatory to injure reputation"; (2) "capable of being prove[n] false and claimed to be false"; and (3) "publicly disseminated so as to create or threaten stigma." ECF No. 34 ¶¶ 18–23. They also argue that they establish the "plus" requirement vis-à-vis the City's alleged deprivation of their property and the "cascade of platform bans and payment-processor terminations." *Id.* ¶¶ 24–26.

Again, the Court agrees with City Defendants. For the reasons set forth below, Plaintiffs' stigma-plus claim stalls right out of the gate.

### A. Plaintiffs do not Establish "Stigma"

A Fourteenth Amendment stigma-plus claim requires the Court to first analyze whether a government official defamed a plaintiff by applying the state-law standard for defamation. *Pisani v. Westchester Cnty. Health Care Corp.*, 424 F. Supp. 2d 710, 718 (S.D.N.Y. 2006) ("Establishing defamation in the § 1983 context is no different than under New York State law."). Defamation, under New York law, requires that:

> a claimant must allege: (1) a defamatory statement of fact, (2) that is false, (3) published to a third party, (4) of and concerning the plaintiff, (5) made with the applicable level of fault on the part of the speaker, (6) either causing special damages or constituting defamation *per se*, and (7) not protected by privilege.

*Edelman v. United States Gov't*, No. 18-cv-2143, 2020 WL 7123175, at *12 (E.D.N.Y. Dec. 4, 2020); *D.F. ex rel. Finkle v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 386 F. Supp. 2d 119, 130 (E.D.N.Y. 2005), *aff'd sub nom. D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 180 F. App'x 232 (2d Cir. 2006).

City Defendants argue that Plaintiffs fail to satisfy the "stigma" requirement because Commissioner Tisch's statements are substantially true, nonactionable opinion, and, therefore, insufficient to state a stigma-plus claim. *See* ECF No. 28 at 17–23. Plaintiffs contest these arguments and argue that three of the Commissioner's statements at the December Press Conference are sufficiently defamatory for purposes of establishing "stigma." *See* ECF No. 6 ¶ 28. For the reasons set forth in detail below, however, Plaintiffs miss the mark. Plaintiffs fail to plausibly allege defamation and, consequently, fail to establish the "stigma" component of their claim.

i.      "Hit list"

The first allegedly defamatory statement Plaintiffs highlight is that Commissioner Tisch "falsely described [Plaintiffs'] playing cards as a 'hit list.'" ECF No. 6 ¶ 28; ECF No. 34 ¶ 20. However, based on the Court's review of the entirety of the December Press Conference, [13] Commissioner Tisch does not use the term "hit list" once during her address.

A statement that never existed cannot be defamatory because, at the very least, it has not been published or disseminated. For the same reason, it cannot be the basis of a stigma-plus claim. *See Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir. 1994); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 n.13 (1985) (failure to allege publication "dooms" a stigma-plus claim); *Walker v. Daines*, No. 08-cv-4861, 2009 WL 2182387, at *10 (E.D.N.Y. July 21, 2009) ("Absent publication or dissemination, a stigma-plus claim fails.").

_____

[13] The Court may review a recording of the December Press Conference and Commissioner Tisch's statements therein, as they are the subject of Plaintiffs' stigma-plus claim. *See Tannerite Sports LLC*, 864 F.3d at 247; *Chambers*, 282 F.3d at 152. The Court reviewed the recording attached to the City Defendants' motion. *See* ECF No. 27-1 (THEMANHATTANDA, *D.A. Bragg and NYPD Commissioner Tisch Announce Murder Indictment Of Luigi Mangione* (YouTube, Dec. 18, 2024) https://perma.cc/K6X2-KT9P).

ii.     "Yesterday the New York Post reported that some extreme activists were circulating a deck of cards with other Most Wanted CEOs to be targeted for assassination"

Plaintiffs also allege that Commissioner Tisch made defamatory statements sufficient for their stigma-plus claim when, while holding up a copy of the December 16, 2024, New York Post, she said: "Yesterday the New York Post reported that some extreme activists were circulating a deck of cards with other Most Wanted CEOs to be targeted for assassination." ECF No. 27-1 at 9:45–10:00; ECF No. 6 ¶ 28. Plaintiffs take issue with two parts of that statement. They object to Commissioner Tisch's use of the term "extreme activists," and they object to her assertion that the so-called activists were "circulating a deck of cards with other Most Wanted CEOs to be targeted for assassination." ECF No. 6 ¶ 28; ECF No. 34 ¶ 20.

In assessing defamation claims, courts look "at the full context of the communication in which the statement appears, while also considering the broader social context or setting surrounding the communication." *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014). Taking both components together, in context, it is clear that this statement is not defamatory, as it is part nonactionable opinion, part substantial truth, and, in any event, "not of and concerning" Plaintiffs. *See Edelman*, 2020 WL 7123175, at *12; *D.F. ex rel. Finkle*, 386 F. Supp. 2d at 130.

First, the Commissioner's description of certain individuals as "extreme activists" is not defamatory because it is nonactionable opinion. "New York law protects derogatory statements which may be categorized as 'opinion' as opposed to 'fact.'" *Chau*, 771 F.3d at 128. Determining which statement is which "is a legal question for the court," and "[a]s with defamation in general," courts look to "the full context of the communication in which the statement appears." *Id.* at 128–29. If a statement contains opinion, the Court must "determine whether the statement is 'pure opinion' (and thus non-actionable) or 'mixed opinion' (and therefore actionable)." *Id.* at 129. Pure opinion is "a statement of opinion which is accompanied

20

by a recitation of the facts upon which it is based or does not imply that it is based on undisclosed facts." *Id.* "Mixed opinion, on the other hand, is an opinion that does imply a basis in undisclosed facts, or facts known only to the author." *Id.*

At the December Press Conference, after summarizing an uptick of "shocking and appalling celebration[s] of cold-blooded murder" in the wake of the Thompson homicide, ECF No. 27-1 at 9:17–9:33, Commissioner Tisch used the phrase "some extreme activists" to describe a subset of individuals who "were circulating a deck of cards with other Most Wanted CEOs to be targeted for assassination," *id.* at 9:45–10:00. Here, it is clear that "extreme activists" is an expression of the Commissioner's opinion, not fact. When analyzed in context, the term is used as an insult, a denigration of those who make light of tragedy. It is not an official edict, nor is it "precise, unambiguous [or] definite." *See Chau*, 771 F.3d at 128–29. Moreover, because the term was "accompanied by a recitation of the facts upon which it [was] based," it is pure opinion. *Id.* at 129. When considered in context, it is merely an epithet and "hyperbole and therefore not actionable opinion." *Id.* (noting that although one "may not appreciate" being insulted, an insult is "an expression of one's view of another," and though "[t]ime may prove the insult misguided, [] the insult is not itself a fact—but rather, is one's perception of facts—at the time it is uttered").

Even if "extreme activists" was not an expression of Commissioner Tisch's view of individuals capitalizing on the homicide of Mr. Thompson, it is not defamatory because it is substantially true. In contesting City Defendants' stigma-based arguments, Plaintiffs remind the Court that, at this stage, they are "required only to raise falsity as an issue, not prove it." *See* ECF No. 34 ¶ 18 (citing *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004)). That may be an accurate statement of law, but it is incomplete. Plaintiffs may not conflate proof and

plausibility. *See Iqbal*, 556 U.S. at 678. Indeed, to state a cognizable defamation claim, Plaintiffs must plausibly plead falsity. *Edelman*, 2020 WL 7123175, at *12; *D.F. ex rel. Finkle*, 386 F. Supp. 2d at 130. Notably, "a statement need not be *completely* true, but can be *substantially* true, as when the overall 'gist or substance of the challenged statement' is true." *Chau*, 771 F.3d at 129 (quoting *Printers II, Inc. v. Prof'ls Publ'g, Inc.*, 784 F.2d 141, 146–47 (2d Cir. 1986)) (emphasis in original). In practice, a "substantially true" statement is one that has the same effect on the audience as that which the complete truth would have produced. *Tannerite Sports, LLC*, 864 F.3d at 242, 247 (affirming dismissal of defamation claim under Rule 12(b)(6) because challenged statement was substantially true).

Recall that, in context, "extreme activists" was used, among other things, to describe individuals who "were circulating a deck of cards with other Most Wanted CEOs to be targeted for assassination." ECF No. 27-1 at 9:45–10:00. That is substantially true based on Plaintiffs' own allegations. Harr is a self-described "activist and political artist." ECF No. 6 ¶ 1. Plaintiffs concede that their designs were well-received and garnered positive attention from their followers on social media. *See id.* ¶ 20. Thus, Plaintiffs' own pleadings demonstrate that the "gist or substance" of this part of the Commissioner's statement is true. *Chau*, 771 F.3d at 129.

As for the second component of the Commissioner's statement—that individuals "were circulating a deck of cards with other Most Wanted CEOs to be targeted for assassination," ECF No. 6 ¶ 28—the same point applies. This part of the statement may not be completely true, but it need not be, as long as "the overall gist or substance of the challenged statement is true." *Chau*, 771 F.3d at 129. Given the context of the December Press Conference and the circumstances surrounding it, the Court concludes that describing Plaintiffs' product as "a deck of cards with other Most Wanted CEOs to be targeted for assassination" captures the "overall gist." *Id.* at 129.

As a preliminary matter, the entire project was inspired by the "Iraqi Most Wanted" cards issued to soldiers in 2003 to help them identify key members of Saddam Hussein's inner circle. *See* ECF No. 6 ¶ 18.[14] This inspiration is apparent in the cards themselves, which, as depicted in the Article, include imagery reminiscent of shooting-range targets. *See* ECF Nos. 31-6, 31-7. Moreover, the print edition of the Article draws a not-so-subtle connection between Plaintiffs' cards and a "twisted card game to hunt down CEOs." ECF No. 31-6. The fact that Commissioner Tisch did not explicitly mention Plaintiffs' disclaimers renders her statements not "completely true," but it does not mean that "the overall gist" of her statement is demonstrably false. *See Chau*, 771 F.3d at 129. Taken together, "the full context of the communication in which the statement appears," and "the broader social context or setting surrounding the communication," an individual could arrive at the same conclusion Commissioner Tisch did. *See Chau*, 771 F.3d at 129. Accordingly, the Commissioner's description of the playing cards was substantially true. *Cf. Tannerite Sports, LLC*, 864 F.3d at 249 (finding that defendant's description of plaintiff's shooting range targets as "bombs" "was, at the least, substantially true" because the targets could explode "in a perversion of their ordinary uses, [if] someone intended to use them to cause explosions").

If pure opinion and substantial truth are not enough, the statement is still not defamatory because "a plaintiff cannot sustain a libel claim if the allegedly defamatory statement is not 'of

---

[14]    *See* Kozaryn, *Deck of cards helps troops identify regime's most wanted*, *supra* note 1 (noting that the "Iraqi Most Wanted" cards featured "a list of 55 key regime leaders [coalition forces in Iraq] intend to pursue, kill or capture."). Because Plaintiffs concede that the point of the cards is to parody the "Iraqi Most Wanted" cards, the Court may take judicial notice of these materials "[s]olely for background and context." *Feliciano v. City of New York*, No. 14-cv-6751, 2015 WL 4393163, at *2 n.3 (S.D.N.Y. July 15, 2015); *Leon v. Shmukler*, 992 F. Supp. 2d 179, 184 n.1 (E.D.N.Y. 2014) (citing *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

and concerning plaintiff' but rather only speaks about a group of which the plaintiff is a member." *Chau*, 771 F.3d at 129. Commissioner Tisch's statement concerns "some extreme activists," ECF No. 27-1 at 9:45–10:00, it does not single out Plaintiffs, "but rather only speaks about a group of which [Plaintiffs are] member[s]." *Chau*, 771 F.3d at 129 (statements "*solely* about the group" insufficient for defamation claim) (emphasis in original).[15]

Plaintiffs may not like being thought of as a member of "some extreme activists [who] were circulating a deck of cards with other Most Wanted CEOs to be targeted for assassination," but that does not transform one component of the statement into something other than pure opinion and it does not render the rest of the statement false. It certainly does not make the statement defamatory. Accordingly, this statement cannot be the basis of Plaintiffs' stigma-plus claim. *See DiBlasio v. Novello*, 413 F. App'x 352, 356 (2d Cir. 2011) ("Because the statement was not false, it cannot form the basis for a stigma plus claim, however stigmatizing it might appear to be.").

iii. <u>"These are the threats of a lawless, violent mob"</u>

Commissioner Tisch's third statement, which characterizes social media threats against executives in the wake of the Thompson homicide as "the threats of a lawless, violent mob," ECF No. 27-1 at 10:00–10:05, does not save Plaintiffs' stigma-plus claim.

The Court already analyzed why the Commissioner's description of certain individuals as "extreme activists," is nonactionable opinion and need not repeat that analysis—the result is the

---

[15]    Arguably, the fact that Commissioner Tisch held up the print edition of the New York Post while making the "extreme activists" remark suggests that one could identify Plaintiffs as the subject of her statement. However, the Commissioner displays only the cover page of the entire print edition, which does not name or depict Plaintiffs. *See* ECF No. 27-1 at 9:44–10:00; ECF No. 31-6 at 2. In any event, even if such a tenuous contextual identification were plausible, a statement "solely about the group" is insufficient. *Chau*, 771 F.3d at 129; *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (collecting cases).

same:  Commissioner Tisch's characterization of social media threats as "threats of a lawless, violent mob" is nonactionable opinion.  *See Chau*, 771 F.3d at 128–29.  The same is true of the portion of the statement "*solely* about the group"; that too is insufficient for a defamation claim.  *See id.* at 129 (emphasis in original).

In sum, none of Commissioner Tisch's statements is sufficient to maintain a defamation claim and, because Plaintiffs fail to plausibly allege defamation, they fail to plausibly allege "stigma" sufficient to establish their stigma-plus claim.[16]

### B.  Nor do They Establish a "Plus"

Not only does Plaintiffs' stigma-plus claim fail for want of sufficient "stigma," it also fails for want of a "plus."  "To qualify as a 'plus,' the state-imposed burden must be separate from the deleterious effects which flow directly from a sullied reputation. . . . The impact that defamation might have on job prospects . . . or any other typical consequence of a bad reputation are not, by themselves, constitutionally cognizable injuries."  *Tafuto v. New York State Off. for Child. & Fam. Servs.*, No. 08-cv-8433, 2012 WL 4459803, at *5 (S.D.N.Y. Sept. 25, 2012).  Relevant here, "[b]urdens that can satisfy the 'plus' prong under this doctrine include the deprivation of a plaintiff's property," and "direct interference with a plaintiff's business."  *Sadallah*, 383 F.3d at 38.

Plaintiffs argue the "plus" element is satisfied by both those theories.  They argue, primarily, that deprivation of Plaintiffs' property (*i.e.*, the alleged confiscation of Plaintiffs' inventory in connection with a seizure warrant on FedEx and direction that shipment of

---

[16]    In light of this conclusion, the Court need not reach City Defendants' argument that Plaintiffs are unable to plead actual malice, *see* ECF No. 28 at 21–22; their argument that Commissioner Tisch's statements are protected by absolute immunity, *id.* at 23–25; or their argument that the Commissioner is entitled to qualified immunity with respect to the stigma-plus claim, *id.* at 28–31.

Plaintiffs' inventory be withheld) satisfies the requirement. ECF No. 34 ¶ 25. They also argue that they satisfy the "plus" requirement by their allegations that the Commissioner's statements caused direct interference with their business operations (*i.e.*, a "cascade of platform bans and payment-processor terminations"). *Id.* Again, however, Plaintiffs miss the mark.

                 i.        <u>Plaintiffs' Property-based Theory is Lackluster</u>

First, Plaintiffs' deprivation-of-property argument is unavailing because it is not sufficiently proximate, and they have not shown that their merchandise was deprived without due process. *See Mudge*, 939 F.3d at 80; *Segal*, 459 F.3d at 213.

Plaintiffs allege that there is sufficient proximity between Commissioner Tisch's statements and the seizure of their merchandise at a FedEx facility over two months later to establish that the seizure was a material state-imposed burden. *See* ECF No. 34 ¶¶ 28–31. However, Plaintiffs' arguments amount to nothing more than conclusory allegations. Plaintiffs argue that Commissioner Tisch's statements are sufficiently proximate to the seizure that occurred over two months later because "she both authored the stigma and directed or ratified the ensuing deprivation" by virtue of her position of authority alone. *See* ECF No. 34 ¶ 30. But, they offer no "further factual enhancement," nor anything other than "labels and conclusions." *Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions . . . will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."). Plaintiffs' simple *ipse dixit* is not enough to establish the requisite proximity. Without more, Plaintiffs' theory of proximity is merely a "legal conclusion couched as a factual allegation," and it is too speculative, even at the motion to dismiss stage, to support their stigma-plus claim. *See id.* at 678–79 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

In any event, Plaintiffs property-based "plus" theory fails because they fail to establish the absence of adequate process. *See Segal*, 459 F.3d at 213; *Hefferan v. Corda*, 498 F. App'x 86, 89 (2d Cir. 2012) ("Because the plaintiff has not established that adequate process was unavailable, his stigma-plus claim fails.").

Plaintiffs allege that they "received no notice of the seizure, no copy of the warrant, and no contact information for the officers or agency involved — only that the action had been carried out by officers in NYPD uniforms." ECF No. 6 ¶ 36. In their Opposition, they argue that they have "sufficiently pleaded a procedural due process violation" because "the seizure of their property" occurred without "notice, hearing, or post-deprivation remedy." ECF No. 34 ¶ 35. Yet again, Plaintiffs miss the point. For their stigma-plus claim to survive, Plaintiffs must establish that there was no process available; that Plaintiffs did not avail themselves of existing process is immaterial. *See Segal*, 459 F.3d at 213; *Hefferan*, 498 F. App'x at 89.

Here, proper process was available: an Article 78 proceeding. "New York's remedy for the recovery of property taken during a police search is an Article 78 proceeding, through which an individual can appeal the action of a state official or agency." *Grant v. Am. Soc'y for the Prevention of Cruelty to Animals*, No. 16-cv-2765, 2017 WL 1229737, at *5 (S.D.N.Y. Mar. 31, 2017) (collecting cases); *see also Moss v. Spitzer*, 798 N.Y.S.2d 482, 482 (2d Dep't 2005) ("A CPLR article 78 proceeding will properly lie to require the return of property, other than contraband, seized pursuant to a search warrant and held for an unreasonable length of time without the commencement of a criminal action."). Plaintiffs' stigma-plus claim "fails on the merits because [they] could have pursued an Article 78 proceeding." *Xu v. City of New York*, No. 21-1059, 2023 WL 4285031, at *2 n.2 (2d Cir. June 30, 2023) ("With respect to stigma-plus claims, '[a]n Article 78 proceeding provides the requisite post-deprivation process—even if [a

plaintiff] failed to pursue it.'"); *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121 (2d Cir. 2011) (same).

ii.      Plaintiffs' Interference-based Theory is Implausible

Plaintiffs' second "plus" theory, concerning the alleged "coordinated suppression of business channels," fares no better. The Court has no doubt that Plaintiffs' inability to access online platforms, which they rely on to support their business, is a burden. *See* ECF No. 6 ¶¶ 32–33. It does doubt, however, that the burden was "state-imposed." *Sadallah*, 383 F.3d at 38. Plaintiffs do not argue that this burden was directly imposed by the state, nor could they, given that the platforms that banned Plaintiffs—TikTok, YouTube, Shopify, Apple Pay, and Instagram—are all non-state actors. And, in fact, Plaintiffs concede that at least some of the decisions involved other private entities, *viz.* Mastercard and Visa. *See* ECF No. 6 ¶ 34. Instead, they argue that Commissioner Tisch imposed the burden indirectly when she condemned and denounced Plaintiffs and their work at the December Press Conference. *See* ECF No. 34 ¶¶ 28–30. They argue that the nexus between Commissioner Tisch's statements and Plaintiffs' de-platforming is "unmistakable." *See id.* ¶ 28. That is an overstatement.

In fact, the nexus between the Commissioner's statement and the alleged interference with Plaintiffs' business is a far cry from "sufficiently proximate." *Mudge*, 939 F.3d at 80. To arrive at Plaintiffs' conclusion—that Commissioner Tisch knowingly distorted Plaintiffs' speech as a means to inspire multiple, unaffiliated third parties to take action that would cause downstream economic consequences on Plaintiff—the Court must not only make a series of protracted inferences, it must suspend well-settled understanding of the meaning of plausibility. Certainly, in such circumstances, the nexus is not "unmistakable." The Court previously discussed the inferential leaps necessary to arrive at Plaintiffs' theory of causation with respect to their First Amendment claim. *See supra* Part I.C. Here, Plaintiffs make the same argument, and,

here too that argument fails.  Plaintiffs' theory requires the Court to climb too many rungs up the ladder of inference to be plausible.  *See Iqbal*, 556 U.S. at 678.

### III.     Plaintiffs' State-Law Claims

In addition to their two federal claims, Plaintiffs bring four claims under various provisions of New York law.  *See* ECF No. 6 ¶¶ 58–87.  Though the Court has supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," 28 U.S.C. § 1367(a), such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997).  And a district court "may decline to exercise supplemental jurisdiction" if it has "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

Here, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims.  Since this case has progressed only to the motion to dismiss stage without the parties conducting any discovery, applying the normal presumption against supplemental jurisdiction is appropriate.  *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) ("A district court usually should decline the exercise of supplemental jurisdiction when all federal claims have been dismissed at the pleading stage."); *Onibokun v. Chandler*, 749 F. App'x 65, 67 (2d Cir. 2019) ("no abuse of discretion" in declining supplemental jurisdiction at motion to dismiss stage).[17]

---

[17]     Although NYP urges the Court to exercise its discretion to retain jurisdiction over Plaintiffs' defamation claim and dismiss the claim on the merits, ECF No. 30 at 28–31, the Court need not reach the issue because, by failing to oppose NYP's motion to dismiss and indicating that they intend to remove NYP as a defendant in their proposed amended complaint, *see* ECF No. 34 ¶ 97, Plaintiffs have abandoned their claim as to NYP.  *See Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 46 n.1 (2d Cir. 2018); *Marvin v. Peldunas*, No. 16-cv-1456, 2020

29

## IV.    Leave to Amend

Attached to their Opposition to the City Defendants' motion, Plaintiffs include a proposed further amended complaint.  *See* ECF No. 34 ¶ 97; ECF Nos. 34-1, 34-2.  When it comes to requests for leave to amend, "[a] court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (affirming denial of leave to amend).  Of course, an opportunity to amend is not required where, as here, "[t]he problem with [Plaintiffs'] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend.").

Here, amendment would be futile because it cannot cure the fact that there is neither a viable First Amendment retaliation claim, nor a viable stigma-plus claim, hiding in Plaintiffs' Amended Complaint—there is no constitutional violation at all.  *See Kristoffersson on behalf of R.R. v. Port Jefferson Union Free Sch. Dist.*, No. 23-7232, 2024 WL 3385137, at *5 (2d Cir. July 12, 2024) (finding leave to amend was futile when plaintiff "has not identified factual allegations she would add to the complaint to state a plausible First or Fourteenth Amendment claim"); *see also Jones-Bey v. Stanislov*, No. 23-cv-5599, 2024 WL 3520636, at *6 (S.D.N.Y. July 23, 2024) ("Because Plaintiff fails to allege a constitutional violation and provides no basis to conclude that

---

WL 5548823, at *7 (S.D.N.Y. Sept. 16, 2020) (collecting cases).  In light of this abandonment, that claim is dismissed with prejudice.  *Farag v. XYZ Two Way Radio Serv., Inc.*, No. 20-cv-4191, 2022 WL 3030346, at *8 (E.D.N.Y. Aug. 1, 2022), *aff'd*, 2023 WL 2770219 (2d Cir. Apr. 4, 2023) (collecting cases).

any amendment could remedy [his] pleadings . . . granting Plaintiff leave to amend would be futile.").

In any event, Plaintiffs have already submitted a proposed further amended complaint that merely "remov[es] the New York Post as a defendant while preserving the factual context of [the Article]," but does not even attempt to remedy the deficiencies of their federal claims. *See* ECF No. 34 ¶ 97; ECF No. 34-1. In such circumstances, "opportunity to replead is rightfully denied." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (denying leave to amend when "plaintiff[s] [are] unable to demonstrate that [they] would be able to amend [their] complaint in a manner which would survive dismissal").

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss for failure to state a claim, ECF Nos. 26, 29, are GRANTED. The federal claims against Commissioner Tisch are dismissed, pursuant to Rule 12(b)(6), with prejudice. The claim against NYP is abandoned and, therefore, dismissed with prejudice. With respect to Plaintiffs' remaining state-law claims against the City Defendants, because the Court declines to exercise supplemental jurisdiction over them, they are dismissed without prejudice.

The Clerk of Court is respectfully directed to enter judgment consistent with this Order and close the case.

SO ORDERED.

*/s/Hector Gonzalez*
  HECTOR GONZALEZ
  United States District Judge

Dated: Brooklyn, New York
      May 18, 2026